UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

─────────────────────────────────────────────

AUDREY K. SEITZ,

        Plaintiff,

        v.                                                        Case No. 19-C-1518

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

─────────────────────────────────────────────

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**

─────────────────────────────────────────────

      Plaintiff Audrey K. Seitz filed this action for judicial review of a decision by the Commissioner of Social Security denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Seitz contends that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the reasons that follow, the decision of the Commissioner will be affirmed.

## BACKGROUND

      Seitz filed an application for a period of disability and disability insurance benefits on May 23, 2016, alleging disability beginning December 23, 2010, when she would have been 23 years old. She listed rheumatoid arthritis, common variable immune deficiency, autoimmune polyendocrine syndrome type 1, adrenal insufficiency, Hashimoto's thyroiditis, chronic pain, chronic headaches, and drug induced aseptic meningitis as the conditions that limited her ability to work. R. 179. After her application was denied initially and on reconsideration, Seitz requested a hearing before an ALJ. On September 7, 2018, ALJ Peter Kafkas conducted a hearing where Seitz, who was represented by counsel, and a vocational expert (VE) testified. R. 31–66.

At the time of the hearing, Seitz lived with her parents in a one-story house in Racine, Wisconsin. R. 38. Seitz obtained a degree in health psychology from Luther College in Decorah, Iowa, and she completed two semesters of graduate school. R. 39, 44. She worked as a care coordinator and community health navigator at Children's Hospital of Wisconsin. R. 39–41. Seitz resigned from her position at Children's Hospital after her doctor advised it was no longer healthy for Seitz to be there. R. 57.

Seitz testified that she was diagnosed with common variable immunodeficiency (CVID) in December 2010. R. 45. She testified that she gets Intravenous Immunoglobulin (IVIG) every four weeks and that the treatment takes about eight hours. *Id.* Seitz reported that a symptom of her IVIG treatments is aseptic meningitis, which causes severe headaches and a stiff neck, and results in Seitz laying down for seven to ten days. R. 47. She also testified that she has systemic rheumatoid arthritis that affects her knees, hips, elbows, and hands. *Id.* Seitz indicated that her rheumatoid arthritis causes morning stiffness and that in the morning she soaks her hands in hot water to reduce the stiffness. R. 48. She testified that her medications help somewhat, but they "still leave a lot to be desired." *Id.* Seitz stated that she was diagnosed with gastroparesis in 2009. She reported that preparing food increases her nausea. R. 52. She testified that she uses morphine daily and that her use of morphine impacts drowsiness, fatigue, attention, focus, and concentration. R. 54. Seitz estimated that she takes 25 pills a day for her conditions. R. 55.

Seitz reported she can lift a gallon of milk, stand for about 20 to 30 minutes, walk for about 15 minutes, and sit for a few hours. R. 50–51. She indicated she has difficulty preparing food, cooking, and doing big loads of laundry. R. 52. Seitz testified that she has difficulty lifting, going down the stairs, and cleaning. She stated she had not driven for a few years. *Id.* Seitz testified that on a good day, she wakes up and takes her medication, and she reported that showering is the

biggest thing she does in a day.  R. 56.  She only showers two to three times a week.  After she showers, she takes a nap.  When she wakes up, she attempts to do laundry or help put groceries away.  After she does some light things, she takes another nap.  After that nap, she visits with her parents while they make dinner.  *Id.*  Seitz stated she has to take a number of breaks throughout the day.  R. 58.

In a thirteen-page decision dated December 6, 2018, the ALJ determined Seitz was not under a disability within the meaning of the Social Security Act from December 23, 2010, through March 31, 2015, the date last insured.  R. 13–25.  The ALJ's decision followed the five-step sequential evaluation process for determining disability prescribed by the Social Security Administration (SSA).  At step one, the ALJ observed that Seitz last met the insured status requirements of the Social Security Act on March 31, 2015, and that she did not engage in substantial gainful activity during the period from her alleged onset date of December 23, 2010, through her date last insured.  R. 15.  At step two, the ALJ found that Seitz had the following severe impairments: seronegative rheumatoid arthritis, common variable immune deficiency, and asthma.  *Id.*  He also noted that Seitz's adrenal insufficiency (Addison's disease), Hashimoto's thyroiditis, chronic headaches, aseptic meningitis, colitis, and gastroparesis were non-severe impairments, as they do not impose any significant restrictions on her ability to perform basic work activities.  R. 16.  At step three, the ALJ concluded Seitz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 18.

Next, the ALJ assessed Seitz's RFC and found that she had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), "except allowing this person to

sit or stand alternatively at will, provided that this person is not off task more than 10 percent of the work period." R. 19. He also found the following limitations:

> The claimant can frequently balance and climb ramps or stairs, and only occasionally crouch, kneel, and stoop, but should never crawl or climb ladders, ropes, or scaffolds. The claimant can frequently reach bilaterally, frequently reach overhead bilaterally, frequently handle bilaterally, frequently finger bilaterally and frequently feel bilaterally. The claimant can have no concentrated exposure to dangerous moving machinery or to unprotected heights. She must avoid concentrated exposure to excessive noise and concentrated exposure to environmental irritants such as fumes, odors, dusts, and gases. Due to pain and fatigue: the claimant is limited to understanding, carrying out and remembering no more than simple instructions; and can perform simple, routine tasks.

*Id.* At step four, the ALJ determined Seitz had no past relevant work, but considering Seitz's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Seitz could have performed, such as order clerk, information clerk, and assembler. R. 24–25. The ALJ concluded that Seitz was not under a disability at any time from the alleged onset date through the date last insured. R. 25. The Appeals Council denied Seitz's request for review, making the ALJ's decision the final decision of the Commissioner.

**LEGAL STANDARD**

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that

4

make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof; a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence that the claimant is able to hold a full-time job. Such evidence, in almost all cases that go to hearing, is not available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe

how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Step Two Determination

Seitz asserts that the ALJ committed an error of law by finding that her chronic headaches were non-severe impairments when assessing the severity of her impairments at step two of the sequential evaluation process. At step two, the ALJ must determine whether the claimant has one or more severe impairments. 20 C.F.R. § 404.1520(c). The inquiry at step two is essentially a "de minimis" screening device that allows the SSA to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); *see also Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) (noting that step two determination of severity is "merely a threshold requirement"). If no severe impairments are found, the case ends with a denial of the application. If the ALJ determines that the claimant has at least one severe impairment, however, the ALJ will proceed to the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. In this case, even if the ALJ erred in determining that Seitz's chronic headaches were non-severe at step two, such error is harmless because the ALJ determined Seitz had severe impairments including seronegative rheumatoid arthritis, common variable immune deficiency, and asthma, R. 15, and continued on with the sequential evaluation to address and evaluate all of Seitz's impairments. In short, the ALJ's step two finding does not warrant remand. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015) (finding that even if ALJ erred in finding that certain impairments were non-severe, such error would have been "harmless because the ALJ properly considered all of [the claimant's] severe and non-severe impairments, the objective

7

medical evidence, her symptoms, and her credibility when determining her RFC immediately after step 3"); *Davis v. Berryhill*, 723 F. App'x 351, 356 (7th Cir. 2018).

### B. Assessment of Seitz's Symptoms

Seitz asserts that the ALJ's assessment of her symptoms rests on an erroneous evaluation of the record. The Social Security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity of work." § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of her pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR 16-3p. "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez*, 336 F.3d at 539. "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal."

8

*Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester*, 920 F.3d at 510.

As an initial matter, Seitz argues that the ALJ used improper boilerplate language in making his credibility determination. She takes issue with the following statement in the ALJ's decision: "[A]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 20. The Seventh Circuit has recently held that "[t]he fact that the 'ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Burmester*, 920 F.3d at 510 (quoting *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013)). The ALJ's use of boilerplate language was not problematic in this case because, as explained below, the ALJ discussed the substantial evidence that supports his decision. Seitz also argues that the ALJ failed to explain the weight he gave to her statements about her symptoms and their limiting effects and which statements he found to be untrue. An ALJ is not required to specify which of the claimant's statements were not credible, however. *See Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").

In addition, Seitz asserts that the ALJ's reliance on objective evidence was not a sufficient basis upon which to find her statements concerning the severity of her symptoms not credible. She argues that, "[o]nce the ALJ found that Seitz's medically determinable impairments could

reasonably be expected to cause the alleged symptoms as the ALJ found, Seitz did not have to support the degree of limitation alleged with medical evidence." Pl.'s Br. at 22, Dkt. No. 20. That is not the law.

SSR 16-3p provides guidance on that issue. In the words of that ruling, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p. The ruling goes on to explain how the objective medical evidence is considered:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

*Id.* The ruling also provides that the Agency "will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *Id.* In this case, the ALJ not only considered the objective medical evidence but also considered other evidence in the record, including Seitz's own statements regarding the history of her impairments, the symptoms she experienced, her responses to treatment and her regular activities. This is entirely consistent with SSR 16-3p.

10

Case 2:19-cv-01518-WCG   Filed 03/25/21   Page 10 of 20   Document 32

The ALJ noted that, when Seitz filed for disability, she alleged rheumatoid arthritis, CVID, and chronic pain. In subsequent reports, he noted Seitz alleged that she can walk for one-tenth of a mile before needing to stop and rest for about 30 minutes, and is further limited in squatting, standing, kneeling, stair climbing, completing tasks, concentrating, and using her hands. She reported that her severe pain limits her ability to concentrate for more than 45 minutes and participate in meaningful work and her fatigue as well as weakness inhibits her ability to even sit at a desk for more than an hour. The ALJ explained that Seitz's CVID makes it easy for her to become acutely ill and can trigger a flare-up, she has difficulty using her hands when buttoning or using zippers, and showering wears her out and she has to nap afterwards. The ALJ noted Seitz endorsed dry mouth, fatigue, joint pain, severe headaches, aseptic meningitis, and nausea as medication side effects. R. 19. The ALJ observed that Seitz also gave similar testimony at the September 7, 2018 hearing. He indicated that Seitz testified that she is on an eight-hour treatment per month with side effects of severe headaches and noted problems bending her neck and climbing stairs. She also reported that her rheumatoid arthritis affects her knees, hands, and wrists and that they become stiff and force her to lie down during the day. He explained that Seitz testified that she had to lie down seven to ten days per month and had five bad days per week. Seitz also testified at the hearing that she can lift a gallon of milk, grasp items with her hands and fingers, stand for 20 to 30 minutes, walk for 15 minutes, and sit for a couple of hours. The ALJ noted that Seitz takes over 15 different medications and that she reported drowsiness, poor focus, and memory problems as medication side effects. He also stated that she indicated she cannot do any work because she takes too many breaks, has to take a lot of days off work, and has a bad memory. R. 20. The ALJ concluded Seitz's statements about the intensity, persistence, and limiting effects

of her symptoms are inconsistent with the medical evidence of record, which reflects a routine and conservative treatment history, and generally benign physical examinations. *Id.*

Seitz asserts that the ALJ failed to properly assess the symptoms related to her headaches, fatigue, and rheumatoid arthritis that would interfere with her ability to maintain competitive full-time employment. A fair reading of the ALJ's decision reveals that he fully considered Seitz's symptoms. The ALJ noted that, in February 2014, Seitz was doing well from a CVID and asthma standpoint. He observed that she had minimal need for her rescue inhaler and continued the same treatment, including IVIG. On April 25, 2014, Seitz complained of localized left-sided back pain that was aggravated by deep breaths and was diagnosed with left-sided back pain. Seitz's CVID and asthma continued to be stable in May 2014. In June 2014, Seitz reported severe and debilitating bilateral knee pain. Seitz saw a rheumatologist who wanted to start her on Enbrel after she had taken Prednisone for the past few days and was not experiencing relief. Seitz also had steroid injections with some benefit but complained of trouble walking due to knee pain. On physical examination, Seitz had tenderness along the joint line and increased pain with range of motion of the bilateral knees but no edema. Her Prednisone dose was decreased from 20 mg daily to 7.5 mg daily and she began Remicaide, Humira, or Enbrel injections. On July 28, 2014, Seitz reported that she tolerated the high dose of IVIG without any of the side effects she had with the lower dose. On July 31, 2014, Seitz indicated she had knee pain with elliptical use but less so with cycling and swimming. She went to classes regularly and was doing her usual activities in September 2014 and was able to walk half a mile in November 2014. R. 20.

The ALJ also noted that Seitz was doing well with her present treatment on January 20, 2015, and had minimal need for a rescue inhaler. R. 21. Her asthma and CVID were both noted to be stable, and she was doing okay with just Singular for her intermittent asthma. Seitz

12

Case 2:19-cv-01518-WCG   Filed 03/25/21   Page 12 of 20   Document 32

complained of fatigue in April 2015 but appeared well and had an unremarkable exam. Following Seitz's hospitalization for IVF hydration in April 2015, Seitz reported that Dilaudid helped bring her bilateral knee pain from ten out of ten down to five out of ten, and she had no abnormal findings on examination. Through May 2015, Seitz was tolerating IVIG infusions, and her CVID and asthma were stable. Seitz had knee pain on May 9, 2015, but indicated that it was tolerable and that she was able to function. In June 2015, she claimed her knee pain prevented her from walking, but at that time she had been off Orencia due to lack of coverage and had only recently started using it. On August 31, 2015, she followed up on a recent visit to the emergency department for bilateral knee pain and was given IV pain medications. Although Seitz had felt fatigued, it was less now compared to a few weeks prior. The ALJ observed that Seitz used her arms and was "walking okay" in December 2015. *Id.*

On April 14, 2016, Seitz complained of severe knee pain that wakes her up at night. Although Seitz appeared uncomfortable, she had a normal exam and was directed to continue to try MS Contin twice daily for pain and Dilaudid as needed. Seitz presented to the emergency room, on May 30, 2016, with increased bilateral knee pain and swelling. Although Seitz reported a low-grade fever and a mild occipital headache, which occurred when she had rheumatoid arthritis flares, she only sought pain relief for her knees. She was diagnosed with a rheumatoid arthritis flare. On July 5, 2016, Seitz was admitted for a monthly IGG infusion and denied adverse reactions to prior IGG infusions. The ALJ noted that, at the appointment, she "rated her fatigue level as only a two out of ten and her pain level as a mere five out of ten." *Id.* On July 20, 2016, Seitz returned to the emergency department with moderate pain in her bilateral knees, but her pain improved after Dilaudid, Benadryl, and Toradol, and she had normal range of motion in her knees and no swelling, effusion, ecchymosis, deformity, laceration, or erythema. In October 2016, Seitz

complained of having pain in her hands and feet and that all of her joints were so sore, swollen, and stiff that her hands hurt when she used them for anything. Seitz was prescribed Prednisone. *Id.* She had been on Simponi for over six months without any change to her symptoms but was otherwise stable with no fever, chills, or infections. R. 22.

The ALJ observed that on February 3, 2017, Seitz stated she was limited by her knee pain but had been walking on the treadmill 30 minutes a day. She was advised to increase activity as tolerated by walking through the day with 20- to 30-minute intervals. Seitz had a stretch of days where she had been feeling pretty well in March 2017; she was walking and was busy being "out and about." *Id.* On August 17, 2017, Seitz reported doing well with Orencia and rheumatology medications, and was stable and functional with MS Contin 45 mg twice daily. On November 17, 2017, Seitz denied headaches, lightheadedness, numbness, and tingling in the hands or feet, tremors of the hands, and history of stroke or seizures. *Id.*

As to Seitz's complaints of headache, the ALJ noted that she tried Dilaudid, Diamox, Potassium, Topamax, and Megace with some initial benefit for her headaches. In November 2014, it was determined that regular IVIG use had been causing increased headaches and was recommended that Seitz switch to subcutaneous immunoglobulin treatment. It was noted that Seitz had been getting a higher rate of IVIG in the infusion center than was ordered and slowing down the infusion rate helped Seitz tolerate the infusions without any adverse reactions of headache. R. 16–17. The ALJ did note, however, that Seitz had a recurrence of symptoms after her infusion in April 2016 despite the slow infusion. R. 17. On April 16, 2016, Seitz's mother advised that Seitz had been reluctant to change to subcutaneous immunoglobulin because the infusion center had become a social outing for Seitz. After some discussion, Seitz was willing to switch to subcutaneous immunoglobulin replacement. In May 2016, it was noted that Seitz did not develop

14

Case 2:19-cv-01518-WCG   Filed 03/25/21   Page 14 of 20   Document 32

a headache after the last infusion and had no other adverse reactions to IVIG. *Id.* Seitz asserts that the ALJ ignored various treatment records, but ALJs are not required to address every page of the record and every line of testimony in their opinions. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

Seitz challenges the ALJ's finding that the medical evidence reflects a routine and conservative treatment history. The ALJ recounted Seitz's history of treatment and noted how she responded to the treatments. The ALJ explained his reasoning that Seitz was generally stable and functional on her medications and supported his reasoning with citations to the record. In short, the ALJ did not err in concluding that the medical evidence of record reflects a routine and conservative treatment history when assessing Seitz's subjective symptoms.

Finally, Seitz asserts that the ALJ failed to assess the factors required to be evaluated under SSR 16-3p. But ALJs are not required to discuss every factor described in 20 C.F.R. § 404.1529(c) when assessing a claimant's subjective complaints. Instead they need only "minimally articulate" their reasoning so as to connect the evidence to their conclusions. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). In this case, the ALJ recognized that Seitz has impairments that impact her ability to work, but not to the degree alleged. He followed the regulations governing the assessment of Seitz's symptoms and provided adequate support and explanations for his findings. His conclusion is not patently wrong and does not necessitate remand.

### C. Treating Physician Opinion

Seitz asserts that the ALJ failed to give controlling weight to some of the opinions of Dr. Jennifer Takata, her treating physician. Generally, the ALJ must give "controlling weight" to the medical opinions of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"not inconsistent with other substantial evidence." *Burmester*, 920 F.3d at 512; 20 C.F.R. § 416.927(c)(2); SSR 96-2p. If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Dr. Takata completed an Attending Physician's Statement in July 2016. R. 1418–19. There, Dr. Takata noted that Seitz had joint pain from rheumatoid arthritis, headaches from autoimmune syndrome, and fatigue and weakness from her adrenal insufficiency. She opined that Seitz was functionally limited in her ability to perform any of her occupational duties and activities and that Seitz was unable to work due to joint pain and headaches as of June 1, 2016, in the long term. R. 1419. She also indicated that Seitz could not work in another occupation. *Id.* Dr. Takata completed another Attending Physician's Statement on September 21, 2017. R. 1584–85. Again, Dr. Takata opined that Seitz was unable to perform work of any kind. R. 1584. She indicated that Seitz has significant loss of psychological, physiological, personal, and social adjustment; has severe limitation of functional capacity; and is incapable of minimal activity. R. 1585. Dr. Takata opined that Seitz can sit for ten minutes, stand for ten minutes, walk for ten minutes, and lift a maximum of 10 pounds in an eight-hour workday. *Id.*

16

Case 2:19-cv-01518-WCG   Filed 03/25/21   Page 16 of 20   Document 32

On May 31, 2018, Dr. Takata completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form. R. 1586–87. Dr. Takata checked boxes indicating that Seitz can less than occasionally lift less than ten pounds and never lift ten or more pounds. R. 1586. She checked a box indicating that Seitz needed a sit/stand/walk option at will during an eight-hour work day; that Seitz can stand, sit, and walk for a total of five minutes in an eight-hour work day; and that Seitz is limited to working zero hours in an eight-hour workday. She opined that Seitz would need more than four unscheduled breaks to rest during an eight-hour work shift and would need to rest more than 30 minutes before returning to work. Dr. Takata also opined that Seitz would be off task 80 percent of the workday and would likely be absent more than four days a month as a result of her condition, symptoms, and treatment. *Id.* Dr. Takata indicated that Seitz could perform less than occasional stooping, crouching, and kneeling and can use her hands, fingers, and arms for five percent of an eight-hour workday. R. 1587. She further indicated that Seitz required a balancing limitation, even when standing or walking on level terrain, and that Seitz must avoid exposure to dust, fumes, chemicals, and marked changes in temperature extremes. *Id.*

The ALJ articulated sufficient reasons for not giving Dr. Takata's opinion controlling weight. The ALJ noted that Dr. Takata has been Seitz's treating source since 2009. R. 23. But the ALJ concluded that Dr. Takata's opinions were too extreme and were inconsistent with the medical evidence of record that show benign physical examinations and multiple reports from Seitz that she is doing well on her medications and is stable and functional. *Id.* If Seitz really was subject to the limitations set out by Dr. Takata, she would have been virtually bed-ridden. Not even Seitz claimed her impairments were that severe. The ALJ also noted that MRIs of Seitz's bilateral knees showed only mild quadriceps tendinosis with minimal adjacent inflammatory

17

change and mild nonspecific thickening of the lateral retinaculum, with trace edema within the suprapatellar fat pad of the left knee. As a result, the ALJ assigned little weight to Dr. Takata's opinions. *Id.*

The record also contains opinions of state agency consultants that conflict with Dr. Takata's opinions. Dr. James Greco reviewed Seitz's records on September 9, 2016, R. 67–75, and Dr. Hemantha Surath reviewed the records at the reconsideration level on March 26, 2017, R. 77–88. Both state agency physicians found Seitz's immune deviancy disorder to be severe but not her thyroid disorder or asthma. Both found Seitz capable of a limited range of light work. They opined that Seitz is capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing or walking for a total of four hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, occasional kneeling, crouching, crawling, and climbing of ramps and stairs but no ladders, ropes, or scaffolds. Dr. Greco limited Seitz to no concentrated exposure to hazards, but Dr. Surath recommended that Seitz avoid all exposure to hazards. Both state agency physicians restricted Seitz to no work at unprotected heights or around dangerous machinery, and no commercial driving. The ALJ gave these opinions substantial weight but adjusted some of their recommended limitations based on the passage of time and Seitz's subjective complaints. R. 24.

Seitz asserts that the ALJ "cherry-picked" evidence from the record and overlooked the medical evidence that showed that her symptoms of headaches and fatigue would cause the need for unscheduled breaks and absenteeism. But none of the evidence Seitz cites refutes the ALJ's conclusion that Dr. Takata's extreme limitations found no support in the medical evidence. Dr. Takata did not provide a citation to any treatment notes that supported the extreme limitations she noted in the Medical Source Statement of Ability to Do Work-Related Activities form she

18

completed. R. 1586–87. In sum, the ALJ noted that Dr. Takata's opinions were not well supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial evidence in the record. Because the ALJ properly articulated his reasons for giving Dr. Takata's opinions little weight, he was not bound by her opinions, and did not err in assessing the weight of the medical source opinions.

### D. RFC Assessment

Seitz asserts the ALJ failed to incorporate appropriate limitations in assessing her RFC. An RFC is an administrative assessment describing the extent to which an individual's impairments may cause physical or mental limitations or restrictions that could affect her ability to work. SSR 96-8p. The RFC represents "the maximum a person can do—despite his limitations—on a 'regular and continuing basis,' which means roughly eight hours a day for five days a week." *Pepper*, 712 F.3d at 362 (quoting SSR 96-8p). In forming the RFC, an ALJ must review all of the relevant evidence in the record and "consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

Seitz asserts that the ALJ failed to address and evaluate her claims that she would need unscheduled breaks and would be absent from work due to her symptoms. She explains that she "does not take the position that the ALJ had to find that she could not maintain competitive full-time employment because of excessive breaks or absenteeism, but rather that the ALJ had an obligation to address and evaluate . . . these limitations in his RFC." Pl.'s Br. at 16. As explained above, the ALJ rejected Dr. Takata's opinion that Seitz would require limitations regarding unscheduled breaks and absenteeism, finding that Dr. Takata's opinions were too extreme and were inconsistent with the medical evidence of record. R. 23. Once he rejected these opinions, he was not required to address them further. The ALJ relied upon Seitz's medical history, medical

19

source statements, opinion evidence, and testimony to assess her RFC. He stated that the RFC assessment was supported by Seitz's "rheumatoid arthritis and CVID that require allowing her to sit or stand alternatively at will, and limit her to sedentary exertion, frequent balancing and climbing of ramps or stairs, occasional crouching, kneeling, and stooping, no crawling or climbing of ladders, ropes or scaffolds, frequent reaching overhead and in all directions, handling, fingering, and feeling bilaterally, with no concentrated exposure to dangerous moving machinery, unprotected heights, or excessive noise." R. 24. He also noted that due to "pain and fatigue, she can understand, carry out, and remember no more than simple instructions, and can perform simple, routine tasks. Her asthma further restricts her to no concentrated exposure to environmental irritants such as fumes, odors, dusts and gases. However, she is generally stable and functional on her medications." *Id.* Substantial evidence supports the ALJ's RFC finding, and he adequately explained how he arrived at that conclusion.

## CONCLUSION

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of March, 2021.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
